**SIGNED this 28 day of November, 2007.**

_____
**Marcia Phillips Parsons**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | |
| LIBERTY FIBERS CORPORATION | No. 05-53874 |
| f/k/a Silva Acquisition Corporation, | Chapter 7 |
| Debtor. | |
| MAURICE K. GUINN, Trustee, and MPLG, LLC, | |
| Plaintiffs, | |
| vs. | Adv. Pro. No. 07-5039 |
| JOLLEY ROCK INVESTMENTS, LLC and A & E SALVAGE, INC., | |
| Defendants. | |

### M E M O R A N D U M

Appearances:   Mark S. Dessauer, Esq.          Maurice K. Guinn, Esq.
               Hunter, Smith & Davis, LLP      Gentry, Tipton & McLemore, PC
               Post Office Box 3740            900 South Gay Street, Suite 2300
               Kingsport, Tennessee 37664      Knoxville, Tennessee 37902
               Attorney for MPLG, LLC          Attorney for Maurice K. Guinn, Trustee

               Mark A. Cowan, Esq.             Clinton R. Anderson, Esq.
               Swanson & Cowan, LLP            508 West 2nd North Street
               717 West Main Street, Suite 100 Morristown, Tennessee 37814
               Morristown, Tennessee 37814     Attorney for A & E Salvage, Inc.
               Attorney for Jolley Rock Investments, LLC

**Marcia Phillips Parsons, United States Bankruptcy Judge**.  This adversary proceeding is before the court on the applications of plaintiffs MPLG, LLC and Maurice K. Guinn, Trustee of the bankruptcy estate of Liberty Fibers Corporation, for preliminary injunctions against the defendants Jolley Rock Investments, LLC and A & E Salvage, Inc.  In the first application, the plaintiffs seek to enjoin Jolley Rock from discharging its basement water directly into the ditch owned by the bankruptcy estate and directing Jolley Rock to discharge its water to the waste water treatment plant ("WWTP") operated by MPLG pending trial.  In the second application, the plaintiffs seek to enjoin Jolley Rock and A & E from continuing to allow the flow or discharge of water from facilities owned and/or controlled by them to the WWTP, pending their agreement to pay for such services, posting of cash bonds, or trial.  For the reasons discussed hereafter, Jolley Rock will be enjoined from discharging its basement water into the ditch owned by the bankruptcy estate, pending trial or pending its agreement to indemnify the estate.  Similarly, A & E will be enjoined from discharging its waste water to MPLG's WWTP, pending trial or A & E's agreement to pay for such services.  In all other respects, the applications will be denied.

## I.  ISSUES

The parties' disputes arise out of their independent operations on a particular manufacturing site in Lowland, Tennessee.  Since 1947, extensive manufacturing operations for the production of various man-made fibers and yarns have taken place on the Lowland site, with the facilities including four different manufacturing plants, a power plant, a water treatment plant, and a landfill. In 1976, a waste water treatment plant was added to the site.  Until the last fifteen years, all of the facilities on site were owned and operated by a single entity, initially American Enka and then BASF Corporation.  Beginning in 1992, however, the manufacturing plants and utilities were split up, sold and resold to various parties, with three different chapter 11 cases occurring along the way. Currently, MPLG owns the WWTP on the site; Jolley Rock owns one of the manufacturing facilities on the site, although it is not currently engaged in manufacturing operations; and the Liberty Fibers bankruptcy estate owns a great deal of the remaining real property, including the remaining manufacturing facilities.  A & E owns the salvage rights to certain equipment on the real property owned by Liberty Fibers.

2

At issue with respect to Jolley Rock is the proper disposal of basement water from the Jolley Rock facility. More particularly, does Jolley Rock have an easement that permits it to discharge its basement water into the storm sewer system located on Liberty Fibers' property, specifically a ditch known as the "Nylon Ditch," where the water then flows directly into the Nolichucky River at a site covered by Liberty Fibers' state permit? Does discharge of this water without prior treatment and without continuous monitoring of the site violate Liberty Fibers' permit?[1] Also at issue is A & E's use of water in connection with its salvaging operations on Liberty Fibers' real property. Is A & E liable for the waste water treatment services which take place as a result of its on-site use of water? Because resolution of these issues will require the court to consider certain easement and other agreements entered into by the parties' predecessors in interest, it is first necessary to briefly review the transactions that led up to each parties' current ownership.

## II. BACKGROUND

In 1992, BASF, the single owner of all of the facilities at the Lowland site, sold the rayon plant operations and the WWTP to Lenzing Fibers Corporation, but retained and continued operating the site's synthetic staple manufacturing plant and the other utilities. In connection with the sale, BASF and Lenzing entered into an easement agreement dated July 31, 1992 (the "Lenzing Easement Agreement"), wherein each party gave the other certain perpetual easements to ensure, in part, that each would have access to the utilities owned by the other. The Lenzing Easement Agreement also contemplated that each would provide certain utility services to the other for a fee pursuant to the terms of a separate material and services agreement (the "Lenzing MSA").

On August 10, 1995, BASF sold its synthetic staple plant to Intercontinental Polymers, Inc. ("IPI"). In connection with the sale, BASF and IPI entered into an easement agreement whereby the easement rights granted to BASF by Lenzing in the Lenzing Easement Agreement were in turn assigned to IPI by BASF (the "IPI Easement Agreement"). The IPI Easement Agreement

---

[1] In addition to the Jolley Rock's basement water, Jolley Rock also has certain waste water from its bathrooms, etc., that is treated by MPLG at its WWTP and for which MPLG seeks payment in this adversary proceeding. However, such services are not at issue in the plaintiffs' applications for preliminary injunction presently before the court.

3

incorporated by reference both the Lenzing Easement Agreement and Lenzing MSA and noted that BASF and IPI had also agreed to enter into a similar MSA (the "IPI MSA"), whereby similar utility and easement services would be provided to IPI. One of the easements BASF granted to IPI in the IPI Easement Agreement, set forth in paragraph 2.1(d), was the following:

> A Non-Exclusive easement . . . to access and use the Storm Sewers located on the BASF Property for the transmission of storm water runoff, snow melt runoff, surface runoff and drainage; and **a Non-exclusive easement to use the "Nylon Ditch" for stormwater and dry weather discharge, subject to the provisions of the NPDES Permit permitting and governing such usage, which BASF agrees to maintain so long as it owns the Powerhouse and for which IPI has no obligations other than as set forth in the IPI MSA**.

(Tr. Exh. 5; emphasis supplied.)

By agreement dated October 10, 1995, BASF transferred ownership of the remaining utilities at the Lowland site, including the power plant, to Lenzing, and Lenzing assumed all rights and responsibilities regarding the utility systems, including the Nylon Ditch. Thereafter on January 31, 1996, Lenzing and IPI entered into an agreement whereby IPI agreed, *inter alia*, to indemnify Lenzing for any losses caused by IPI's discharges into the Nylon Ditch (the "IPI Indemnity Agreement").

On October 20, 2003, IPI ceased operations and immediately thereafter filed for bankruptcy relief under chapter 11. With court approval, IPI sold substantially all of its assets, which primarily was the manufacturing facility and operations it had previously purchased from BASF, to Jolley Rock on August 31, 2006. Jolley Rock's purchase included all easements held by IPI, but it did not include assumption of any indemnity or service agreements.

On November 24, 2003, Lenzing filed its own petition for bankruptcy relief under chapter 11, and thereafter changed its name to Liberty Fibers Corporation. Pursuant to court order, the debtor sold all of its assets, including the Liberty Fibers name, to the Silva Acquisition Corporation, which then changed its name to Liberty Fibers Corporation and continued the operations. After the sale, the second Liberty Fibers Corporation continued to operate the WWTP, providing waste water treatment services for itself and for other entities on site, including IPI. On September 29, 2005, the second Liberty Fibers Corporation filed its own chapter 11 petition, commencing the underlying

4

bankruptcy case, which shortly thereafter was converted to chapter 7 at the debtor's request. Maurice Guinn was appointed chapter 7 trustee.  On September 21, 2006, an order was entered approving the Trustee's sale of salvage rights for certain assets of the bankruptcy estate to A & E. On March 2, 2007, the Trustee sold thirty-five acres of the estate's real property, the WWTP, and certain assets associated therewith to MPLG.

In connection with the Trustee's sale of the WWTP to MPLG, the Trustee also conveyed to MPLG a non-exclusive easement to use and operate the Liberty Fibers' National Pollution Elimination System Permit,  No. TN 0068187, issued by the Tennessee Department of Environment and Conservation, Division of Water Pollution Control ("TDEC") on August 31, 2005, (the "NPDES Permit"), pending MPLG's application to the state of Tennessee for its own permit.  Liberty Fibers' NPDES Permit authorizes it to discharge industrial process wastewater, storm water, etc., from the Lowland facilities into the Nolichucky River at certain outfall points.  MPLG agreed to indemnify and hold the Trustee harmless against all claims arising out of MPLG's operation of the WWTP under the authority of the NPDES Permit.

A.  The Dispute with A & E

The Trustee's sale of assets to A & E for salvage gave A & E approximately two years, until October 6, 2008, to dismantle and remove the purchased assets from Liberty Fibers' real property. The parties' purchase agreement provided that A & E would be responsible for all costs incurred in removed the purchased assets, including any electricity and water required for the dismantling process.  In connection with this dismantling process, which is underway, A & E brings water onto Liberty Fibers' real property in order to clean equipment with a high pressure water rig and for use in A & E's on-site restrooms.  The waste water from the restrooms and the waste water used in cleaning travel via the sewer systems on the estate's realty to the WWTP where the waste water is then treated.  Moreover, A & E has been pumping water out of at least one abandoned on-site basement in order to salvage equipment located in the basement.  At least initially, A & E employees dumped the pumped water directly onto the ground still owned by the bankruptcy estate, until they were told to stop by the Trustee's employees.  According to the Trustee, the water has been tested in the past and found to be acidic, exceeding permit levels that would allow the water to be

5

discharged directly into the public waterways, and the Trustee did not want to contaminate the ground with the water. Tom Montgomery, one of the Trustee's employees, testified that he had several conversations with A & E that if they put the water into the sewer—and they had agreed that it needed to go into a sewer rather than the ground—that they should not assume that the Trustee or the bankruptcy estate was assuming any responsibility for the waste water or for the cost of treating it at the WWTP.

In a letter to A & E dated April 20, 2007, MPLG proposed to enter into a service agreement with A & E whereby MPLG would provide waste water treatment services to A & E in consideration for a monthly fee equal to A & E's pro rata share of MPLG's costs of operation, plus a profit. Request was made in the letter that if A & E did not desire to enter into such an agreement, that it must immediately discontinue the flow of waste water to the WWTP via the sewer. In a letter from counsel for A & E dated April 30, 2007, counsel advised MPLG that A & E would not pay for the use of any services provided by MPLG and that it had no authority to stop the discharge of waters from the bankruptcy estate.

B.  The Jolley Rock Dispute

The main building in the facility Jolley Rock purchased from IPI was originally built over an underground spring, necessitating since its construction the daily pumping of thousands of gallons of spring water from the basement. Initially, the spring water removed from the basement was pumped into the Nylon Ditch, part of the storm sewer system, where it flowed directly to and was discharged into the Nolichucky River without treatment. At some point prior to Jolley Rock's purchase of the facility, however, the water from the basement was pumped into the sanitary sewer system where it then flowed to the WWTP for treatment before its release into the Nolichucky River.[2] When IPI was in bankruptcy, it only paid $500 a month for its waste water treatment

_____

[2] According to Cal Bonowitz, the basement water from the facility was diverted to the WWTP because the basement water had always been clean water and clean water flowing through the WWTP made for a smoother operation in that it helped dilute spills and industrial waste water otherwise being treated at the WWTP. Mr. Bonowitz was employed at the Lowland site from 1979 to 2002, initially as an employee of American Enka, then BASF and then Lenzing. His positions
(continued...)

6

services.  Previously, however, IPI and other on-site users of the WWTP had paid for waste water treatment services calculated on a pro rata basis, with each user paying its proportionate share of the WWTP's total costs of operation.  For example, if  25% of the water treated at the WWTP on a monthly basis belonged to one particular user, that user would pay a fee representing 25% of WWTP's costs of operation.  Jolley Rock's purchase of the IPI facility in August 2006 did not address treatment of the basement water or include assumption of any service agreement regarding waste water treatment services.  Nonetheless, during the first few months of its ownership of the IPI facility, Jolley Rock daily discharged the water from the basement into the sanitary sewer system which carried the water to the WWTP for treatment.  As such, demand was eventually made on Jolley Rock, first by the Trustee and then by MPLG, that Jolley Rock pay for its proportionate share of the costs of operating the WWTP, based on the same pro rata basis previously paid by prior users. The Trustee billed Jolley Rock $31,236.81 for September 2006 usage, $31,324.07 for October 2006 usage, and $22,532.41 for November 2006, respectively representing 62%, 63%, and 58% of the total cost of operating the WWTP for the particular month.  These percentages represented a higher share of the WWTP's expenses than previously borne by Jolley Rock's predecessors since the total number of WWTP users on the Lowland site has decreased over the years.

Concerned by these high costs since that it had not even begun manufacturing operations, Jolley Rock contacted TDEC in November 2006 and asked that it be permitted to discharge the basement water directly into the Nolichucky River without treatment, observing that test results it had obtained indicated that the water contained no hazards that would require that it first be processed through the WWTP.  In response, TDEC advised Jolley Rock that it had determined based on the sampling data submitted that the pollutant levels should not create a water quality issue if the water were released directly into the Nolichucky River but that Jolley Rock would need to obtain permission from Liberty Fibers, presumably because Jolley Rock did not have direct access to the Nolichucky River.  Rather than obtaining permission from Liberty Fibers, Jolley Rock requested and received approval on December 25, 2006, from TDEC to be covered under the Tennessee Storm

-------

[2](...continued)
included site environmental manager, vice president of environment, health, and safety, and president and CEO of Lenzing Fibers Corporation.

Water Multi-Sector General NPDES Permit, which authorized Jolley Rock to discharge "storm water associated with industrial activity" into the Nolichucky River.  Armed with this permit, early this year Jolley Rock began discharging its basement water into the Nylon Ditch owned by the Liberty Fibers bankruptcy estate, where the water then directly flows to and enters the Nolichucky River at Outfall 002, under Liberty Fibers' NPDES Permit.

By letter dated January 19, 2007, the Trustee made demand that Jolley Rock immediately cease discharging water directly into the Nylon Ditch.  It was the position of the Trustee that because Jolley Rock was not engaging in any ongoing monitoring of the water prior to its discharge into the public waters of the state of Tennessee at the site owned by the bankruptcy estate and for which the estate holds a NPDES permit, Jolley Rock's direct discharge subjects the bankruptcy estate to possible liability.  Similarly, upon MPLG's subsequent acquisition of the WWTP and related authority to operate under Liberty Fibers' NPDES Permit, MPLG demanded that Jolley Rock cease what it characterized as an illegal discharge, observing that no permission had been granted allowing Jolley Rock to discharge water into bankruptcy estate's Nylon Ditch, and seeking to reach an agreement whereby the basement water would be treated at the WWTP, with payment to MPLG for its services.

When attempted negotiations to resolve the disputes with Jolley Rock and A & E failed, the Trustee and MPLG filed suit against them in this court on May 8, 2007, seeking injunctive and declaratory relief and money damages.  Concurrently with the filing of the complaint, the plaintiffs filed two applications for preliminary injunction against the defendants.  A hearing on the applications was held on May 29, 2007, and June 4, 2007, with the parties subsequently filing memoranda of law on the issues and proposed findings of fact and conclusions of law.

<u>III.  STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION</u>

The Sixth Circuit Court of Appeals has stated that in determining whether to issue a preliminary injunction under Federal Rule of Civil Procedure 65, applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7065, a court must examine four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued: (3) whether the

issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "These factors are not prerequisites, but are factors that are to be balanced against each other. A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.* (citations omitted).

A.  Regarding A & E Salvage

(1)  Likelihood of Success on the Merits

In order to determine whether the movants have demonstrated a likelihood of success on the merits, the court must first examine the parties' causes of actions set forth in the complaint. As to A & E specifically, MPLG asserts that it will continue to be damaged and harmed if A & E is permitted to send wastewater to the WWTP with no obligation to pay for such services, and that A & E should be enjoined from continuing to discharge water, including storm water to the WWTP, pending A & E's posting of a cash deposit. The Trustee and MPLG assert that A & E is indebted to them for waste water treatment services already provided, with the Trustee being entitled to a judgment in the amount of $3,000 and MPLG to a judgment in the amount of $8,981.99. Alternatively, the plaintiffs assert that A & E has been unjustly enriched by having received waste water treatment services at the expense of the plaintiffs, and that A & E should be required to pay the value of such services.

A & E's response is that it has no liability or responsibility for payment of any waste water treatment services. It notes that it is doing the salvaging on bankruptcy estate property and contends that the estate is responsible for all sewage expenses occurring on site. A & E's basis for this argument is that the Trustee's motion to sell the WWTP to MPLG recited that a portion of the purchase price paid by MPLG for the facility was a credit to the Trustee for the anticipated treatment of waste water from the real property continued to be owned or controlled by the estate. Thus, maintains A & E, the estate has already made arrangements with MPLG for waste water treatment services for water from estate property.

9

Based on the consideration of the evidence, the court concludes that the likelihood of plaintiffs prevailing on the merits at a trial in this matter is substantial.  The August 25, 2006 purchase agreement between A & E and the Trustee expressly provides at section 6.7(b) that "[t]he cost of removing the [purchased] Assets shall be borne by the Buyer." (Tr. Exh. 14.)  The fact that the Trustee may have an agreement with MPLG whereby the estate's waste water treatment services are covered does not inure to the benefit of A & E because it was not a party to the Trustee's agreement with MPLG and there is nothing in the A & E's purchase agreement that obligates the Trustee to pass on this benefit to A & E.  Moreover, the Trustee's motion to sell the WWTP was filed on December 27, 2006, long after A & E had completed its purchase of the salvage assets.  Therefore, no argument can be made that A & E relied on the representations in the Trustee's motion in purchasing the salvage assets from the estate.

Because A & E is bringing water onto the estate property for use in its operations, it is responsible for disposing of the water once it has been used.  A & E has no authority from the Trustee to discharge the waste water onto the real property owned by the estate.  Neither can it place the waste water into the sewage system for treatment at the WWTP by MPLG and expect the Trustee to bear the cost.  Disposal of the wastewater is a cost of dismantling the purchased assets which under the purchase agreement is to "be borne" by A & E as purchaser.

<u>(2)  Irreparable Harm to Plaintiffs</u>

With respect to whether the plaintiffs will suffer irreparable harm unless an injunction against A & E is entered, there is risk to the Liberty Fibers' bankruptcy estate in the form of depreciation of the value of its real property if A & E were to pump contaminated water into the ground, which depreciation would be extremely difficult to calculate.  Moreover, because A & E is conducting its salvage operation on estate property, any spillages of oil or other contaminates from A & E's waste that make its way into the public streams could subject the bankruptcy estate to liability.  As to irreparable harm to MPLG, generally MPLG should be adequately compensated by money damages, a factor which weighs against the imposition of an injunction.  However, the evidence establishes that MPLG cannot stop the flow of A & E's waste water to the WWTP, after such water is placed in the sewer system, without interrupting the flow of waste water to the WWTP

10

from other users of the facility.  Given that MPLG is an involuntary provider of water treatment services to A & E, the court finds this factor to be in the plaintiffs' favor.

### (3)  Substantial Harm to Others.

Regarding whether the imposition of the requested injunction would cause substantial harm to others, there was no evidence that harm to third parties would result.  As to harm to A & E,  Greg Sawyer testified that A & E would still be able to operate if the injunction went into effect; that little, if any, water was needed in the dismantling process; and that removing basement water was not essential to their salvage operations.  Although Mr. Sawyer indicated that lack of access to water could delay their development plans, this general statement is insufficient to establish substantial harm.  Thus, this factor presents no obstacle to the imposition of an injunction.

### (4)  Public Interest

Lastly, as to the issue of whether the public interest would be served by issuing the injunction, little evidence was submitted on this subject.  Undeniably, however, it is in the public interest that an entity removing water from a site on which synthetic fibers has been made for the last 50 years properly dispose of the water.  Accordingly, based on all of the foregoing, an order will be issued enjoining A & E from discharging water onto real property owned by the estate and from discharging water for flow to the WWTP, pending its agreement to pay for such services, the posting of a bond, or trial.

## B.  Regarding Jolley Rock

### (1)  Likelihood of Success on the Merits

As with respect to A & E, the court must first consider whether the plaintiffs have shown a likelihood of success on the merits as to their causes of action against Jolley Rock. The plaintiffs allege that they will suffer irreparable harm if Jolley Rock is permitted to continue to discharge water from its basement area into the Nylon Ditch where it then flows directly into the Nolichucky River at a site covered by Liberty Fibers' NPDES Permit.  The plaintiffs maintain that these direct discharges, which take place without any prior monitoring or testing of the waters, constitute

violations of Liberty Fibers' NPDES Permit and subject the estate to potential environmental liability. As such, the plaintiffs seek to enjoin Jolley Rock's continued release of its untreated basement water into the Nylon Ditch for direct discharge to the Nolichucky River.

Moreover, MPLG seeks to enjoin Jolley Rock from sending water to the WWTP pending Jolley Rock's agreement to pay for such services or a trial in this matter. MPLG also requests that the court declare that any easement rights of Jolley Rock related to the WWTP are terminated based on the Jolley Rock's unauthorized conduct. Lastly, both plaintiffs allege that Jolley Rock is indebted to each of them for the waste water treatment services they have previously provided it, with the Trustee being entitled to a judgment in the amount of $85,000 and MPLG in the amount of $31,028.82, such amounts calculated on Jolley Rock's proportionate share of the costs of operating the WWTP. Alternatively, the plaintiffs contend that they may recover from Jolley Rock under a theory of unjust enrichment, based on the value of the waste water treatment services they have provided Jolley Rock.

Jolley Rock's response to these allegations is that it has an easement over the estate property that allows it to use the Nylon Ditch for the discharge of its basement water and that it has its own permit from the state of Tennessee authorizing its discharge into the Nolichucky River. According to Jolley Rock, the state of Tennessee does not require continuous monitoring of the basement water, nor does it require that the basement water be treated prior to its discharge. Further, maintains Jolley Rock, plaintiffs have produced no evidence establishing that the basement water is contaminated and to the contrary, Jolley Rock has tested the water five times since its purchase of the facility and the water has never shown an unacceptable level of contamination. Jolley Rock observes that the state of Tennessee has never cited the plaintiffs or Jolley Rock for any violation caused by Jolley Rock's discharge of untreated water into the Nolichucky River. Lastly, Jolley Rock states that it will indemnify both plaintiffs for any damages caused by its basement water.

The plaintiffs' response is that Jolley Rock has neither an easement nor a effective permit. According to the plaintiffs, the alleged easement held by Jolley Rock as an successor in interest to IPI no longer exists, having terminated by its own terms, and Jolley Rock's permit is only for storm water and the basement water is not storm water. Moreover, the plaintiffs assert that the mere fact

12

that the water has been tested on five occasions and found to be uncontaminated does not remove the risk that it could be contaminated in the future and without ongoing continuous monitoring, the estate is at risk because water is being discharged at its permit site, Outfall 002. Lastly, the plaintiffs attach no significance to the lack of action by the state of Tennessee, observing that nothing prevents the state from determining in the future that Liberty Fibers has violated its permit and assessing the estate for the damage.

The source of Jolley Rock's easement argument relates to the IPI Easement Agreement between BASF and IPI, where in paragraph 2.1(d), as previously quoted, BASF granted IPI:

> a Non-exclusive easement to use the "Nylon Ditch" for stormwater and dry weather discharge, subject to the provisions of the NPDES Permit permitting and governing such usage, which BASF agrees to maintain so long as it owns the Powerhouse and for which IPI has no obligations other than as set forth in the IPI MSA.

The IPI Easement Agreement specified that the easements granted therein were of perpetual duration, that they were appurtenant to the property of the party to whom they were granted, and inured to the benefit of such party and each subsequent owner of the property.

As previously noted, Jolley Rock's purchase of the IPI assets included the purchase of IPI's real property, including all easements. Jolley Rock asserts that, as successor in interest to IPI, it has an easement based on the above-quoted language of the IPI Easement Agreement, and that therefore, it may discharge its basement water into the Nylon Ditch currently owned by the Liberty Fibers bankruptcy estate.

MPLG's response is that, by its terms, any easement rights conveyed by this provision would cease to exist upon BASF no longer maintaining the NPDES permit or no longer owning the Powerhouse. Because both conditions are now present: BASF's NPDES permit has expired and it no longer owns the Powerhouse, the Nylon Ditch easement granted Jolley Rock has terminated, according to MPLG. Alternatively, argue the plaintiffs, even if the easement is still in existence, by its terms it is "subject to the provisions of the NPDES Permit permitting and governing such usage." Thus, the plaintiffs contend, any discharge must comply with Liberty Fibers' NPDES Permit, which requires ongoing monitoring of the water discharged, a requirement Jolley Rock has admittedly failed to satisfy.

MPLG's easement termination argument is based on its reading of the phrase in Paragraph 2.1(d) of the IPI Easement Agreement, "which BASF agrees to maintain . . . ." MPLG reads this phrase as referring to the NPDES Permit referenced in the immediately preceding clause. However, in the court's view, a more logical reading of the phrase is that the word "which" refers back to the Nylon Ditch, such that what BASF is agreeing to maintain is the Nylon Ditch rather than the permit. Permits are more likely to be *retained* rather than *maintained*. Moreover, it is common for easement agreements to address who has the responsibility for maintaining the easement. Cal Bonowitz testified at trial that initially the main source of water into the Nylon Ditch was the cooling water from the Powerhouse. (Tr. Transcript at 378.) Because BASF owned the Powerhouse at the time, it would have been reasonable for the parties to agree that BASF rather than IPI would maintain the Nylon Ditch. Based on this interpretation, the court reads the provision as follows: (1) a non-exclusive easement to use the Nylon Ditch for storm water and dry weather discharge is granted; (2) use of the Nylon Ditch is subject to the provisions of the NPDES Permit permitting and governing such usage; (3) BASF agrees to maintain the Nylon Ditch so long as it owns the Powerhouse; and (4) IPI has no obligation for the Nylon Ditch other than as set forth in the IPI MSA.

From this reading, the court rejects MPLG's assertion that the easement was conditional and expired when BASF no longer owned the Powerhouse or no longer had the NPDES permit in its name. While undisputedly these events have transpired, they have not resulted in a termination of the easement. Rather, the only thing that has terminated is BASF's obligation to maintain the Nylon Ditch since it no longer owns the Powerhouse. Moreover, subsequent events indicate that the parties continued to recognize IPI's easement even after BASF sold the Powerhouse. As previously noted, BASF transferred the Powerhouse and related utility systems to Lenzing in October 1995, only a few months after the IPI Easement Agreement was entered into in August 1995, and Lenzing rather than BASF became the holder of the NPDES permit. Under the terms of the purchase agreement between BASF and Lenzing, Lenzing assumed all rights and responsibilities regarding the utility systems, including the Nylon Ditch. Because of this assumption, Lenzing and IPI entered into the subsequent January 31, 1996 IPI Indemnity Agreement, whereby IPI's responsibilities and liabilities with respect to discharges into the Nylon Ditch were spelled out. Specifically, IPI agreed not to release any hazardous materials into the Nylon Ditch and agreed to be solely responsible for the cost of

14

complying with all applicable environmental laws and permits regarding releases into the Nylon Ditch.[3]  IPI also agreed to be responsible for any contaminations from its releases, including environmental injury to the Nylon Ditch or the Nolichucky River, and agreed to indemnify Lenzing from any injuries caused by its operations.  The fact that Lenzing entered into the IPI Indemnity Agreement is implicit recognition by Lenzing that IPI had an easement to use the Nylon Ditch, and that IPI's water would be entering the public waterways under Lenzing's permit.[4]  And, similarly, IPI's execution of the agreement suggested that it understood that its easement was subject to the provisions of the NPDES Permit governing the Nylon Ditch, now held by Lenzing, and subject to whatever obligations were imposed on it in the IPI MSA.[5]  Thus, based on all of the foregoing, the court concludes that Jolley Rock has an easement to use Liberty Fibers' Nylon Ditch, and that, therefore, plaintiffs are unlikely to prevail on this issue at trial.

Jolley Rock's easement, however, is not unrestricted.  As set forth in the IPI Easement Agreement, use of the easement is subject to compliance with the NPDES Permit governing the Nylon Ditch.[6]  Jolley Rock suggests that it is not necessary for it to comply with the provisions of

---

[3] The IPI Indemnity Agreement also required IPI to maintain a BMP that covered all IPI discharges into the Nylon Ditch.  According to Cal Bonowitz, "BMP" stands for "Best Management Practices" and is "basically a plan that says what you're going to do to maintain control of your discharges."  Mr. Bonowitz testified that IPI produced and gave a BMP to Lenzing. (Tr. Transcript at 392.)

[4] Cal Bonowitz testified that he was environmental manager for Lenzing at the time, that he was the "instigator" of the IPI Indemnity Agreement, and that he was aware at the time of the Agreement that IPI had an easement to send water to the Nylon Ditch.  (Tr. Transcript at 355, 358.) According to Mr. Bonowitz, "All I was trying to do by this document was to get some legal language that would enable us, if we had spills or violations of our permits and we were fined because of operations of [IPI], that we could come back to them and receive restitution."  (Tr. Transcript at 358.)

[5] The IPI MSA was not submitted into evidence at trial.  Thus, it is unclear what obligations were imposed on IPI in the IPI MSA.  Presumably, this question will be fully answered at a trial in this proceeding.

[6] As noted, while this court reads paragraph 2.1(d) of the IPI Easement Agreement as imposing no additional obligations on IPI in return for its grant of an easement, the paragraph does
(continued...)

15

Liberty Fibers' NPDES Permit, because it has its own permit from the state. Jolley Rock's permit is a Tennessee Multi-Sector Permit, whereby Jolley Rock is covered under the general permit for discharges of storm water associated with industrial activity. The plaintiffs argue that the permit held by Jolley Rock is invalid with respect to its discharge of basement water into the Nylon Ditch because basement water is not storm water and because the permit authorizes discharge into the Nolichucky River. Moreover, the plaintiffs correctly point out that Tennessee regulations do not authorize the issuance of a general permit for discharge of storm water when the storm water being discharged is already regulated by an individual NPDES permit which in this case is Liberty Fibers' NPDES Permit.

In this court's view, Jolley Rock's permit, and issues regarding its validity and whether it covers basement water, are irrelevant. As set forth in the IPI Easement agreement, the easement to use the Nylon Ditch is "subject to the provisions of the NPDES Permit permitting and governing [its] usage." The permit governing such usage is the one held by Liberty Fibers because Liberty Fibers is the owner of the Nylon Ditch and the holder of the permit for Outfall 002 where the water from the Nylon Ditch enters the Nolichucky River. As testified by Cal Bonowitz, "The permit holder is responsible for all outfalls covered under that particular permit." (Tr. Transcript at 423.) Mr. Bonowitz also testified that even if Jolley Rock or someone else has a permit, if there is a violation of Outfall 002, the state of Tennessee will be looking to the Liberty Fibers, the holder of the permit for this outfall. Thus, Jolley Rock's use of the Nylon Ditch must comply with the provisions of Liberty Fibers' Permit.

The plaintiffs argue that the Liberty Fibers' NPDES Permit requires treatment of water discharged at Outfall 002. However, there is nothing in the permit that specifies that water discharged at Outfall 002 must be treated first. In fact, such a contention is not even logical, since, according to the evidence presented at trial, water treated at the WWTP is discharged at Outfall 001, while water placed in the Nylon Ditch goes directly into the Nolichucky River at Outfall 002 without

---

[6](...continued)
to state "other than as set forth in the IPI MSA." While this court can only surmise as to the obligations imposed on IPI in the IPI MSA, it would not be surprising if these obligations included indemnity obligations for any harm caused BASF by IPI's use of the granted easements.

prior treatment.  This conclusion is consistent with Liberty Fibers' NPDES Permit which provides that Liberty Fibers is authorized to discharge through Outfall 001 "treated industrial process wastewater, sanitary wastewater, misc. utilities wastewater, coal pile runoff, storm water runoff and landfill leachate," which appears to include types of water which would require treatment, while discharge through Outfall 002 is limited to "non-contact cooling water, reservoir drainage, and storm water runoff." (Tr. Exh. 3.)

In this same vein, the plaintiffs argue that Jolley Rock's basement water may not be discharged at Outfall 002 because it is not storm water.  The individuals who testified at trial disagreed over the proper classification of the water being pumped from the Jolley Rock basement. Cal Bonowitz testified that the water is both ground water and a dry weather discharge (Tr. Transcript 366, 409-410), noting that if the water originates from rain, it is storm water and that if it originates underground, it is ground or spring water.  (Tr. Transcript at 284.)  Greg Worley opined that storm water includes ground water, but admitted that the EPA definition of storm water does not include ground water.  (Tr. Transcript at 288.)  On the other hand, plaintiffs' witness Tom Montgomery, one of the Trustee's employees and a former employee of BASF and Lenzing, referred to the Jolley Rock basement water as storm water and even indicated that the state of Tennessee considered the water to be storm water.  (Tr. Transcript at 44, 50.)

Regardless of the technical term for the water pumped from Jolley Rock's basement, the court concludes that it is permissible for it to flow through the Nylon Ditch into the Nolichucky River at Outfall 002.  As established by Mr. Bonawitz's testimony, the water is dry water discharge, and plainly the easement granted in the IPI Easement Agreement permits the Nylon Ditch to be used for dry water discharge.  Moreover, since it appears to have always been the case that water placed in the Nylon Ditch flowed directly to the Nolichucky River, it may be presumed that the permit at the time authorized dry water discharge to be discharged at Outfall 002.  There was no indication that the NPDES Permit held by Liberty Fibers now is different, or has stricter requirements, than the permit in effect at the time the easement was granted.  Further, the January 31, 2007 letter from Woodson Smith of TDEC indicated that he had inspected the basement water and that "uncontaminated basement or foundation groundwater can be discharged along with site storm water and not be considered an illicit discharge."  (Tr. Exh. 39.)  This letter suggests, consistent with the

testimony of Mr. Montgomery, that the state of Tennessee considers Jolley Rock's basement water to be storm water, or at a minimum, that the difference is irrelevant. Thus, based on the foregoing, the court is unable to conclude at this time that discharge of Jolley Rock's basement water into the Nylon Ditch for discharge at Outfall 002 violates Liberty Fibers' NPDES Permit.

This conclusion leads into the last contention in this regard, that Jolley Rock's discharge is violating Liberty Fibers' NPDES Permit because continuous monitoring is not taking place as required by the permit. However, unlike Outfall 001 which under the permit has daily and monthly effluent limitations for a lengthy number of pollutants, the only effluent limitation for Outfall 002 appears to be with respect to acidity, the pH factor. Liberty Fibers' NPDES Permit indicates that the pollutants sampled at the internal monitoring point 020 for Outfall 002 are monitored on a "report only" basis on the discharge monitoring reports, which are submitted monthly. (Tr. Exh. 3, at 2.) Thus, contrary to plaintiffs' contention, although regular monthly monitoring of Outfall 002 is required, there appears to be no requirement that continuous monitoring occur.[7]

In summary, this court concludes, based on the evidence presented at the hearing on the motion for preliminary injunction, that Jolley Rock has an easement to discharge its "dry weather discharge" (i.e., basement ground water) into the Nylon Ditch owned by the Liberty Fibers bankruptcy estate and that discharge of this water into the Nolichucky River at the site covered by the Liberty Fibers' NPDES Permit, does not generally appear to violate the permit, notwithstanding Jolley Rock's failure to continuously monitor or test the water prior to its discharge. As such, this court finds that the plaintiffs' likelihood of success on the merits of these issues at trial to be weak.

(2)  Irreparable Harm to Plaintiffs

As to whether the plaintiffs will suffer irreparable harm if the injunctions are not granted, because the court concludes that Jolley Rock's failure to use MPLG's waste water treatment services for its basement water is not inappropriate, similarly irreparable harm as to MPLG has not been

---

[7] Additionally, there was no evidence before the court that indicated that the holder of the easement would have the obligation to monitor and test the water that it places into the Nylon Ditch. This obligation or restrictions placed on such disposal may have been set forth in the IPI MSA.

18

established.  On the other hand, however, Jolley Rock's discharge at Outfall 002 subjects the Liberty Fibers bankruptcy estate to potential liability, notwithstanding Jolley Rock's easement.  The outfall point for Jolley Rock's basement water is on Liberty Fibers' real property and covered by Liberty Fibers' NPDES Permit.  As permit holder, Liberty Fibers is liable for any damages to the state of Tennessee that occurs as the result of improper or wrongful discharge at Outfall 002.  Because Jolley Rock did not assume the indemnity agreement that had existed between IPI and Lenzing and there is otherwise no indemnity agreement between Jolley Rock and the Trustee, the Liberty Fibers bankruptcy estate is undeniably at risk if Jolley Rock discharges contaminated water into the Nylon Ditch for direct flow into the Nolichucky River.[8]  Liberty Fibers' predecessors in interest, BASF and Lenzing, were protected from this risk by the IPI Indemnity Agreement and presumably by the obligations imposed on the beneficiary of the Nylon Ditch easement by the Lenzing MSA and the IPI MSA, although neither of these documents were presented at trial.  In other words, it appears that Jolley Rock's predecessors had certain obligations imposed on them in connection with their use of the Nylon Ditch, while Jolley Rock has none, other than the general one that usage be subject to the terms of the permit.  To permit Jolley Rock to continue in this unrestricted fashion does subject the Liberty Fibers estate (and MPLG as assignee of the permit) to possible irreparable harm, a factor in favor of granting an injunction in this regard.

### (3)  Substantial Harm to Others and the Public Interest

No evidence was presented indicating that the issuance of an order enjoining Jolley Rock from discharging its basement water into the Nylon Ditch until such time as it enters into an indemnity agreement with the Liberty Fibers estate as permit holder for Outfall 002 (and MPLG to the extent it is operating under the permit) would cause substantial harm to others.  To the contrary, Jolley Rock represented at trial that it was amenable to such an agreement and that it had the financial resources to indemnify the estate for any liabilities caused by any improper discharge. And, undeniably, the public interest would be served by enjoining a party from discharging water into public waterways until it agrees to be liable for any resulting harm or damages.  Accordingly, these

---

[8] As testified by Cal Bonawitz, the Trustee is "in a very vulnerable position" unless he has indemnity agreements with the parties that put water into the Nylon Ditch.  (Tr. Transcript at 389.)

factors are no impediment to the issuance of an injunction.

C.  Summary

     In conclusion as to the merits of the preliminary injunction applications, an order will issue enjoining A & E from discharging its water directly onto the real property owned by the Liberty Fibers bankruptcy estate or into the sanitary sewer system for treatment by MPLG at its waste water treatment plant, pending trial, the posting of bond, or pending its agreement to pay MPLG for such services.  As to Jolley Rock, an order will issue enjoining Jolley Rock from discharging its basement water directly into the ditch owned by the bankruptcy estate until such trial, the posting of a cash bond, or until Jolley Rock's execution of an indemnity agreement with the Trustee, similar to the IPI Indemnity Agreement, whereby the estate and its successors in interest are fully protected from liability caused by any illegal discharge by Jolley Rock.  To the extent the plaintiffs' applications for preliminary injunction seek to direct Jolley Rock to discharge its basement water through the sanitary sewer system located on site for flow to MPLG's WWTP, the applications will be denied.

IV.  JURISDICTIONAL BASIS FOR ISSUANCE OF PRELIMINARY INJUNCTION

     As a final note, the court finds it necessary to briefly address the jurisdictional basis of this ruling.  In their complaint, the plaintiffs allege that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O), or alternatively that this is a proceeding related to a case under title 11 of the United States Code, which the court may hear pursuant to 28 U.S.C. § 157(c)(1).  In response, Jolley Rock denies these allegations as to MPLG's causes of action and contends that the court lacks subject matter jurisdiction over any dispute between it and MPLG, although Jolley Rock does not otherwise challenge the court's jurisdiction as to the Trustee's claims against it.  A & E does not allege lack of subject matter jurisdiction in its answer, but does state that it "is not certain that this proceeding is a 'core' proceeding, or whether the issues are properly before this court."

     28 U.S.C. § 1334 grants jurisdiction to the district court over four types of bankruptcy matters: (1) cases under title 11; (2) proceedings arising under title 11; (3) proceedings arising in cases under title 11; and (4) proceedings related to cases under title 11.  *Beneficial Nat'l Bank USA v. Best Receptions Sys., Inc. (In re Best Reception Sys., Inc.)*, 220 B.R. 932, 942 (Bankr. E. D. Tenn.

1998). The first category refers to the bankruptcy case itself, initiated by the filing of a petition. *Id.*
The second category refers to causes of action created by the Bankruptcy Code, while the third
encompasses proceedings which could not exist outside of a bankruptcy case. *Smith Mech.*
*Contractors, Inc. v. Premier Hotel Dev. Group (In re Premier Hotel Dev. Group)*, 270 B.R.243, 252
(Bankr. E.D. Tenn. 2001). Actions in these two categories, proceedings arising under or in cases
under title 11, are collectively referred to as "core proceedings." *See* 28 U.S.C. 157(b)(2). The
Trustee's claim against the defendants are undeniably core proceedings because they concern the
administration of the estate and affect the Trustee's liquidation of the estate assets. *See* 28 U.S.C.
157(b)(2)(A) and (O).

On the other hand, MPLG's causes of action against the defendants are not created by the
Bankruptcy Code and they could have existed outside of this bankruptcy case. Thus, this court only
has jurisdiction over MPLG's claims against the defendants if they are "related" to Liberty Fibers'
bankruptcy case. According to the Sixth Circuit Court of Appeals:

> The usual articulation of the test for determining whether a civil proceeding is related
> to bankruptcy is whether the outcome of that proceeding could conceivably have any
> effect on the estate being administered in bankruptcy. Thus, the proceeding need not
> necessarily be against the debtor or against the debtor's property. An action is
> related to bankruptcy if the outcome could alter the debtor's rights, liabilities,
> options, or freedom of action (either positively or negatively) and which in any way
> impacts upon the handling and administration of the bankrupt estate.

*Robinson v. Michigan Consolidated Gas Co.*, 918 F. 2d 579 (6th Cir. 1990) (quoting *In re Pacor,*
*Inc.*, 743 F.2d 984, 994 (3rd Cir. 1984)). Subsequently in *Celotex Corp. v. Edwards*, 514 U.S. 300,
115 S. Ct. 1493 (1995), the Supreme Court noted that the "related to" jurisdiction of the bankruptcy
court is "comprehensive" but not "limitless." *Id.* at 308. It extends to suits between non-debtor
parties only if the action has "an effect on the bankruptcy estate." *Id.* Applying these principles,
the Sixth Circuit in the *Dow Corning* case concluded that the bankruptcy court had related to
jurisdiction over actions between non-debtor parties where the defendants had existing or potential
claims against the debtor for contribution and indemnification. *Lindsey v. O'Brien, Tanski, Tanzer*
*& Young Health Care Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 493-94 (6th Cir.
1996).

Based on the foregoing, this court readily concludes that related to jurisdiction, at a

minimum, exists over MPLG's claims against A & E.  A & E is conducting its salvage operations on real property owned by the bankruptcy estate and the sanitary sewer system into which A & E discharges its waste water transverses the estate's property.  MPLG has indicated that if A & E does not pay for the waste water treatment services, MPLG is looking to the estate because the waste water originated on the estate's realty.  Similarly, A & E's asserts that the estate, not A & E, is liable for the cost of the waste water treatment services because salvaging operations took place on estate land.  Consequently, resolution of MPLG's claims will almost certainly impact the estate being administered in bankruptcy.

As to MPLG's claim for injunctive relief against Jolley Rock, MPLG asserts that subject matter jurisdiction exists because MPLG has agreed to indemnify and hold the bankruptcy estate harmless against all claims arising out of MPLG's operation of the WWTP.  However, Jolley Rock is not asserting any claims against the bankruptcy estate arising out of MPLG's operation of the WWTP so any indemnity obligation on the part of MPLG is irrelevant to this proceeding.  Nor does it appear, from an initial observation, that MPLG's request that Jolley Rock be required to treat its basement water at MPLG's WWTP will have any effect on the Liberty Fibers bankruptcy estate as long as the estate is otherwise protected from liability by Jolley Rock.  Nonetheless, it is not necessary for this court to conclusively resolve this issue at this stage of the proceeding, since no injunctive relief in favor of MPLG is being ordered against Jolley Rock at this time.

Orders will be entered in accordance with the foregoing.

# # #