**SIGNED this 23 day of January, 2009.**

_____
**Marcia Phillips Parsons
UNITED STATES BANKRUPTCY JUDGE**

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| In re    LIBERTY FIBERS CORPORATION
         f/k/a Silva Acquisition Corporation,
                         Debtor. | No. 05-53874
Chapter 7 |
| MAURICE K. GUINN, Trustee, and MPLG, LLC,
         Plaintiffs,
vs.
A & E SALVAGE, INC.,
         Defendant. | Adv. Pro. No. 07-5039 |

**M E M O R A N D U M**

Appearances:

| | | |
|---|---|---|
| Mark S. Dessauer, Esq.
Hunter Smith & Davis, LLP
Post Office Box 3740
Kingsport, Tennessee 37664
*Attorney for MPLG, LLC* | Maurice K. Guinn, Esq.
Gentry, Tipton & McLemore, PC
900 South Gay Street, Suite 2300
Knoxville, Tennessee 37902
*Attorney for Maurice K. Guinn, Trustee* | Clinton R. Anderson, Esq.
Anderson & Anderson
508 W. 2nd North Street
Morristown, Tennessee 37814
*Attorney for A & E Salvage, Inc* |

**Marcia Phillips Parsons, United States Bankruptcy Judge.** In this adversary proceeding, the plaintiffs seek to recover monetary damages for waste water treatment services provided to the defendant. For the following reasons, judgments in favor of the plaintiffs will be awarded against the defendant on the basis of quantum meruit. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A).

I.

The debtor Liberty Fibers Corporation ("Debtor") filed for bankruptcy relief under chapter 11 on September 29, 2005. An order converting the case to chapter 7 was entered shortly thereafter on November 21, 2005. Maurice Guinn was appointed chapter 7 trustee ("Trustee"). At the time of the bankruptcy filing, the Debtor owned numerous assets, including a rayon manufacturing plant and a waste water treatment plant and related facilities ("WWTP"), located on a site in Lowland, Tennessee. The Trustee continued to operate the WWTP after the bankruptcy case's conversion, not only for the benefit of the estate but also for the benefit of other entities on the Lowland site.

On August 25, 2006, the Trustee entered into an agreement with J & N Salvage whereby it purchased certain assets of the Debtor ("Purchase Agreement"). This court entered an order on September 21, 2006, approving the proposed sale. Subsequently, an agreed order was entered October 5, 2006, modifying the sale order to allow J & N Salvage's assignment of its interest in the Purchase Agreement to A & E Salvage, Inc. ("A & E"). The Purchase Agreement provided that between the sale's closing date and October 6, 2008, the purchaser would dismantle and remove all purchased equipment from the estate's real property.

Shortly after the sale to A & E closed, A & E began dismantling and removing the purchased assets from the estate's real property. In its dismantling operations, A & E used water brought on-site by the city of Morristown. The waste water created by A & E's use flowed through a series of sewers located on the estate's real property to the WWTP where it was treated prior to its discharge into the Nolichucky River. The Trustee billed A & E for the treatment of its waste water but A & E refused to pay.

On March 2, 2007, the Trustee sold the WWTP to MPLG, LLC which then took over the operation of the facility. After the sale, A & E continued to generate waste water in connection with its dismantling operations, with the waste water continuing to flow through the bankruptcy estate's sewer lines to the WWTP where it was automatically treated. MPLG made demand on A & E to

2

cease generating waste water or to pay for the waste water treatment services provided, but A & E refused.

Thereafter, on May 8, 2007, the Trustee and MPLG commenced the present adversary proceeding, seeking not only a judgment against A & E, but also an injunction prohibiting A & E from allowing the flow or discharge of water from facilities owned or controlled by A & E to the WWTP, pending its agreement to pay for such services, posting of cash bonds, or trial. In its answer, A & E denied that it was liable for payment of any waste water treatment services and maintained that the cost was the responsibility of the bankruptcy estate as the owner of the real property on which the salvaging operations were taking place. A & E argued that the Purchase Agreement did not address waste water treatment services and pointed out that it had not otherwise agreed to pay for such services, either by the bankruptcy estate or by MPLG.

After a hearing solely on the plaintiffs' application for preliminary injunction, this court entered an order on November 28, 2007, enjoining A & E from discharging its water directly onto the real property owned by the Liberty Fibers bankruptcy estate or into the sanitary sewer system for treatment by MPLG at its WWTP, pending trial, the posting of bond, or entry of an agreement to pay MPLG for such services. In issuing this injunction, the court concluded that the likelihood of plaintiffs prevailing on the merits at trial in this matter was substantial. Specifically, the court rejected A & E's argument that it had no responsibility for the waste water treatment services provided to it. Observing that the Purchase Agreement expressly provided that "[t]he cost of removing the [purchased] Assets shall be borne by the Buyer," this court concluded:

> Because A & E is bringing water onto the estate property for use in its operations, it is responsible for disposing of the water once it has been used. A & E has no authority from the Trustee to discharge the waste water onto the real property owned by the estate. Neither can it place the waste water into the sewage system for treatment at the WWTP by MPLG and expect the Trustee to bear the cost. Disposal of the waste water is a cost of dismantling the purchased assets which under the Purchase Agreement is to "be borne" by A & E as purchaser.

(Docket #31, Memo. Op. at 10.)

A trial on the remaining issue in this adversary proceeding of whether A & E is indebted to

3

the plaintiffs was held on May 29, 2008.[1] The Trustee asserts that the bankruptcy estate is entitled to a judgment of $7,000 against A & E, which represents a $50 per day charge for waste water treatment services from October 13, 2006, the date after the sale to A & E closed, to March 2, 2007, the date the estate sold to MPLG the WWTP. MPLG seeks a judgment against A & E in the amount of $20,355.97 for waste water treatment services provided from March 3, 2007, to December 19, 2007, when the city of Morristown at A & E's direction in response to this court's November 28, 2007 injunction disconnected the water to the site. Testifying at the May 29, 2008 trial were Tom Montgomery, the executive vice president for quality and site services for the Debtor; Michael Ball, the president and managing member of MPLG; and Mark Sawyer, an owner and manager of A & E. The parties agreed that the evidence submitted at the injunction hearing would be deemed a part of the trial record.

II.

A very brief and partial history of the Lowland, Tennessee manufacturing site is helpful to understanding the present dispute. As addressed in this court's November 28, 2007 memorandum opinion, beginning in 1947 and lasting more than 50 years, extensive manufacturing operations for the production of various man-made fibers and yarns took place on the Lowland site. In many respects the site was self-sufficient as the site included an electrical power plant that provided electricity to the site's various manufacturing facilities, a water treatment plant, a landfill, and as of 1976, the WWTP. Initially, all of the facilities on the Lowland site were owned and operated by a single entity until 1992 when the manufacturing plants and utilities were split up, sold, and resold to different parties, with the parties entering various easement and services agreements to insure that each manufacturing facility would have access to the on-site utilities, with the manufacturing facilities, as a general rule, sharing the costs of operating the utilities, or at least the WWTP, based on each facility's pro rata use of the WWTP. For example if 25% of the water treated at the WWTP on a monthly basis belonged to one particular user, that user would pay a fee representing 25% of the WWTP's costs of operation, including its capital improvements. Additionally, if one party created extra costs for the WWTP by an unusual discharge, then that party would be responsible for

---

[1] A & E did not contest the plaintiffs' request that upon trial the preliminary injunction be converted into a permanent one. Accordingly, a separate order permanently enjoining A & E will be issued in this regard.

4

those additional costs.

When the Trustee took over control of the WWTP, he continued this same method of paying for the operations of the WWTP, although the Trustee made an exception for the owner of one of the manufacturing facilities, Intercontinental Polymers, Inc., after it went into bankruptcy and ceased operations. By agreement, the Trustee charged the bankruptcy estate of Intercontinental Polymers, Inc. $500 per month for waste water treatment services.

Prior to the Trustee's sale to A & E, there was no indication that the Trustee and the management of A & E had any communications regarding who would be responsible for waste water treatment services utilized by A & E in its dismantling operations. The Purchase Agreement does not specifically address such services. Paragraph 6.7(b) of the Agreement provides the following:

> During the Dismantling Period, Buyer at its expense shall maintain appropriate public liability insurance, and be responsible for procuring and paying for any electricity and water as may be required for the Dismantling Process. The cost of removing the [Purchased] Assets shall be borne by the Buyer.

On December 18, 2006, the Trustee sent A & E an invoice for its share of site utilities from October 13, 2006, through November 30, 2006. This invoice included $2,935.56 for electricity, $792.42 for 25% of the site's water bill, and $2,400 for WWTP services, calculated at $50 per day for 48 days. Two subsequent invoices, for similar charges for the months of December 2006, January 2007, and February 2007 were subsequently sent to A & E by the Trustee. Tom Montgomery testified that A & E was billed for waste water treatment services because it was bringing water onto the site through the municipal water system. A & E used this water for various purposes, including on-site restrooms, cleaning equipment with a high pressure water rig, putting out occasional fires caused by the dismantling process, and to wet asbestos prior to its removal to prevent it from becoming airborne. As the water was used for these purposes, it would go into the on-site sewer system to the WWTP where it was treated prior to its discharge into the area's streams. Additionally, A & E would also pump ground water out of various basements on site in order to salvage equipment located in the basements. This ground water would also go to the WWTP for treatment. And, on one occasion in October 2006, A & E had a diesel spill that went to the WWTP.

Montgomery testified that the $50 per day figure charged A & E was "an estimate based on

5

how much water they used versus how much we used," with the estate estimating that A & E used about a 1,000 gallons of municipal water per day, plus the additional water pumped from basements and from a fire truck was not supplied from the municipal water. According to Montgomery, A & E had 20 employees or contractors that had access to all the site's restrooms. In comparison, by agreement the estate charged Paint Oak, another company on the Lowland site, $833.33 per month or approximately $27 per day and Paint Oak's only water use, which was estimated at 500 gallons a day, was for restroom facilities for its four employees. As such, Montgomery testified that he believed that the amount the estate was charging A & E was more than reasonable and conservative. During this time period, the Trustee's costs of operating the WWTP were in the range of $48,000 to $50,000 per month.

Montgomery admitted that allocating the costs of the WWTP to the various site users was a complicated matter. He testified that the estate had not been able to determine exactly how much waste water A & E generated because it did not have the necessary equipment to measure such use over a period of time. He noted that, generally speaking, all of the water that came on site from the city of Morristown went to the WWTP, although there were leaks at various times when water lines were broken. Initially, the on-site water meter was in the estate's name, although A & E switched the meter to its name in mid-December 2006. Notwithstanding A & E's placement of the water meter in its name, the bankruptcy estate and its tenants continued to share the meter. According to Montgomery, the estate's tenants were D & S Pump Service, which had three or four employees; the Postmaster, who was the sole employee; TJ Box, which had no employees occupying the space on a regular basis and whose employees were told not to use the restroom when on the site; and two employees of the bankruptcy estate. Additionally, after its purchase of the WWTP, MPLG was on A & E's water meter until MPLG got a separate meter on May 18, 2007.

Montgomery testified that he and Nick Smith, a representative of A & E conversed about the first invoice, with Smith having questions as to how the water costs were allocated since at that time the water meter was still in the name of the Debtor. Montgomery also testified that Smith had questions about the $50 per day charge for waste water treatment and whether it was appropriate but their discussions were not adversarial.

Montgomery testified that this WWTP was the only sewerage system or waste water

6

treatment in the area. He noted that at some point the city of Morristown gave quotes for pump and haul services, and that he told A & E that it would be okay for it to use any service provided by the city but that if it continued to use the WWTP it would need to help cover the cost. At the earlier injunction hearing, Montgomery also testified that he had several conversations with A & E representatives that if they placed water pumped from the basements into the sewer they should not assume that the Trustee or the estate was assuming any responsibility for the waste water or for the cost of treating it at the WWTP.

Michael Ball testified that the monthly operational costs for the WWTP at the time MPLG purchased it was at or above $50,000 monthly, but that MPLG was able to reduce operating costs to between $29,000 and $31,000 by reducing the number of employees and other cost saving methods. Ball testified that he attempted to reach a service agreement with A & E upon MPLG's purchase of the WWTP but was unable to do so. By letter dated April 20, 2007, Ball requested that A & E either enter into a service agreement or discontinue the flow of waste water to the WWTP by April 30, 2007. A & E responded in a letter from their attorney dated April 30, 2007, which stated that it did not agree to pay for any waste water treatment services and that it had no authority to stop the discharge of waters from property of the estate.

Ball testified that in June 2007, MPLG began billing A & E at a fixed monthly rate of $4,500 based on an agreement with Eric Guenberg of A & E, and that pursuant to this agreement MPLG had initially sent invoices asserting that A & E was indebted to it for $48,853.58, which represented $4,500 per month from March 2007 until December 2007 when A & E stopped having municipal water brought on-site, plus a late fee assessed monthly of 1.5% on the balance. Mr. Ball testified that he later learned that Guenberg did not have the authority to bind A & E to this arrangement. Approximately one month before trial, MPLG sent A & E revised invoices that showed an indebtedness due of $20,355.97. This amount was based on the same pro rata share of costs that MPLG used for its other customers and that the Debtor and its predecessors had used, although MPLG also included a 30% profit but did not include capital expenditures.

Ball testified that MPLG determined each customer's pro rata share of the costs of operating the WWTP by calculating the percentage that each user's water volume bore to the total volume of flow to the WWTP. If a user had a water meter, as did A & E, its water usage was determined by

7

its meter readings based on the assumption that all water brought on-site went to the WWTP for treatment; if the customer did not have actual flow meters, its volume was estimated by agreement. Thus, the amounts charged A & E under the revised invoices were based on A & E's municipal water meter, although MPLG discounted these invoices by $317.17, $100, and $200 to reflect its own water usage during the months of March, April and May 2007 when MPLG shared a meter with A & E.  MPLG used municipal water for its restrooms and the credits were based on water usage of 5-10 gallons per day per person for its three or four on-site employees.

Mark Sawyer testified that when A & E switched the on-site water meter to its name, it discovered and repaired many leaks, and that notwithstanding the switch, the bankruptcy estate and its on-site tenants continued to use city water that was on A & E's water meter and that was paid for by A & E, without reimbursement from the estate.  Sawyer also testified that MPLG, after its purchase of the WWTP, used city water that came on-site through A & E's meter until May 18, 2007.  Sawyer testified that on March 2, 2007, the day MPLG purchased the WWTP, he informed Ball that A & E was not responsible for waste water treatment services, as under the Purchase Agreement with the Trustee it was only responsible for water and electricity.  Sawyer admitted that A & E continued thereafter to have water brought on-site, believing that the bankruptcy estate was responsible for the cost of treating the waste water.

Sawyer testified that because the estate and its tenants were also on its water meter, in his view it was not possible to determine how much water A & E used in relationship to that used by the estate and its tenants.  Sawyer testified the water usage according to A & E's water meter over the relevant time period up until the water was disconnected on December 19, 2007, was as follows:

| Period of Time | Water Usage by Gallons |
|---|---|
| January 2007 | 339, 600 |
| February 2007 | 277,000 |
| March 2007 | 355,800 |
| April 2007 | 252,600 |
| May 2007 | 266,800 |
| June 2007 | 70,700 |

8

| | |
|---|---|
| July 2007 | 25,300 |
| August 2007 | 28,300 |
| September 2007 | 17,700 |
| October 2007 | 21,100 |
| November 2007 | 25,000[2] |

Sawyer attributed the dramatic drop-off from 266,800 gallons to 70,700 gallons in June 2007 to the fact that MPLG went off its water meter, stating that its salvaging operations did not change, although Montgomery testified to the contrary that A & E's salvaging operations did slow down. Sawyer also testified that A & E had portable toilets on site from the very beginning that were used by workers in the field, even though admittedly a few workers would use the office restrooms when they came in at lunch or on break. Sawyer testified that had all the water billed to A & E by the city of Morristown been treated at Morristown utility rates, A & E would owe a total of $12,280.77, but denied that this amount was a reasonable charge for services rendered by MPLG, citing its failure to take into account the water leaks.

III.

Recognizing that it has no contract with A & E, MPLG seeks an equitable recovery based on unjust enrichment. The Trustee, on the other hand, asserts that because its Purchase Agreement with A & E provides that A & E must bear all costs of dismantling, A & E is contractually obligated to pay it for waste water treatment services. Alternatively, the Trustee argues that he may also recover from A & E on behalf of the estate under unjust enrichment.

As an initial matter, the court rejects the argument that A & E is contractually obligated to pay the bankruptcy estate pursuant to the Purchase Agreement. While the Purchase Agreement does provide that the cost of removing the purchased assets shall be borne by A & E, nothing in the Purchase Agreement provides that the estate will provide waste water treatment services to A & E or that A & E agrees to accept and pay the estate for such services. Accordingly, any recovery by the estate is limited to unjust enrichment.

---

[2] The court notes that these amounts differ from the amounts set forth on Exhibit 64, a chart prepared by MPLG to list A & E's water meter readings.

Claims based on the doctrine of unjust enrichment, which is often referred to as quantum meruit, have long been recognized by Tennessee courts. *See Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). "Quantum meruit, 'as much as he deserves,' is an equitable doctrine based upon the concept that no one should be unjustly enriched by taking the benefits of another's labor, services or material without paying a reasonable amount for them." *Hall & Waller & Assocs. Architects, Inc. v. Lambuth College*, No. 02A01-9109CH00196, 1992 WL 252510, *5 (Tenn. App. Oct. 6, 1992).

> A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
>
> 1. There is no existing, enforceable contract between the parties covering the same subject matter;
>
> 2. The party seeking recovery proves that it provided valuable goods or services;
>
> 3. The party to be charged received the goods or services;
>
> 4. The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
>
> 5. The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998) (citations omitted). Recovery under this theory is not based on the intention of the parties; rather it is an obligation created by law and "founded on the principle that a party receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." *B & L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 217 (Tenn. App. 2004) (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d at 154). *See also Ferguson v. Nationwide Property & Cas. Ins. Co.,* 218 S.W.3d 42, 50 (Tenn. App. 2006) ("Contracts implied in law are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice."). The measure of recovery in quantum meruit is limited to the actual value of the goods and services provided. *In re Estate of Marks,* 187 S.W.3d 21, 32 (Tenn App. 2005).

Applying these five elements of quantum meruit to the facts of the instant case, it is readily evident that the first three exist. As noted, there is no contract between the Trustee and A & E whereby the parties agreed that the estate would provide waste water treatment services to A & E

10

in return for payment or whereby A & E would share the costs. Similarly, there is no such agreement between MPLG and A & E. Both the estate and MPLG provided valuable services, and A & E received the services. As previously recognized by this court, A & E, through its activities in salvaging the purchased assets, created waste water for which A & E was responsible under the Purchase Agreement for removing or treating. It had no authority from the Trustee to simply dump the waste water onto the estate's real property. Therefore, regardless of A & E's efforts to disavow the need for waste water treatment services or its argument that it was not responsible for payment, it without question received services from both plaintiffs.

As to the fourth element of quantum meruit, whether "the circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated," the court questions why the Purchase Agreement did not specifically address this cost since it did expressly provide that A & E would be responsible for payment of electricity and water required for the dismantling process. A & E may not have contemplated that it would need to remove its waste water but undoubtedly the Trustee should have since the estate had already been providing waste water treatment services to other on-site users. It was not clear from the evidence when A & E were first informed by the Trustee that it would need to provide for its own waste removal other than when the estate sent the first invoice on December 18, 2006. Thus, at least from that point forward, A & E undoubtedly understood that it was the Trustee's position that A & E must share in the cost of treating and removing the waste water generated on-site. Moreover, MPLG informed A & E from the time that it closed on the purchase of the WWTP that it was looking to A & E to pay for the waste water services provided to it. Accordingly, the court concludes that the fourth element of quantum meruit has been met in this case.

Regarding the fifth element, whether "the circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment," the court similarly answers the question in the affirmative. In this regard, the court notes that it is somewhat sympathetic to A & E's position. Because the Purchase Agreement only specifically references electricity and water as the utilities to be borne by A & E, the court can understand why it initially believed that it was not responsible for waste water treatment services. Nonetheless, A & E should have realized that it was running a risk by continuing to utilize the Trustee's, and then MPLG's, waste water treatment

11

services without resolving the issue of liability. Because A & E continued to obtain the benefit of plaintiffs' services and took no action to terminate such services, either by arranging for an alternative method of removing its waste water or by advising the city of Morristown to disconnect the water meter, it would be inequitable to conclude that it had no liability for such services, at least from the time it first received an invoice from the Trustee.

Before leaving this subject, this court notes that A & E cites the case of *Travelers Insurance Co. v. Williams*, 541 S.W.2d 587, 590 (Tenn. 1976), wherein the Tennessee Supreme Court stated that "one is not unjustly enriched by a benefit 'forced upon' him as the result of services voluntarily and officiously performed by another who has been expressly informed by the alleged promisor that his services are not desired." A & E argues that because it advised MPLG in a letter dated April 30, 2007, that it did not agree to pay for its services, MPLG was a mere volunteer and therefore not entitled to payment. However, this court found at the hearing on the preliminary injunction that MPLG was an "involuntary provider of water treatment services to A & E," because "MPLG cannot stop the flow of A & E's waste water to the WWTP, after such water is placed in the sewer system, without interrupting the flow of waste water to the WWTP from other users of the facility." (Docket #31, Memo. Op. at 10-11.) Moreover, Greg Sawyer testified on A & E's behalf at the earlier hearing that little, if any, water was needed by it in the dismantling process and that A & E would still be able to operate if the injunction went into effect. A & E's ability to terminate the waste water treatment services provided by the plaintiffs was ably demonstrated when it notified the city of Morristown to cut off its water meter when this court enjoined it from further discharge. Accordingly, A & E's volunteer argument is not applicable to the present case.

Based on all of the foregoing, the court concludes that all elements necessary for recovery in quantum meruit exist in this case. Counsel for A & E conceded as much at the conclusion of the hearing in this matter when he stated that A & E did not dispute any of the five elements and argued, instead, that the value of such services was too speculative to entitle the plaintiffs to a judgment against A & E. In this regard, A & E cites the fact that MPLG gave it two different sets of invoices, the first evidencing an indebtedness of $48,853.58 and then shortly before trial a revised set of invoices that reflects a debt of $20,355.97. A & E also argues that the applicable standard for determining the reasonable value of services is based on "the customs and practices prevailing in that kind of business," citing *Lawler v. Zapletal*, 679 S.W.2d 950, 955 (Tenn. App. 1984), and

12

contends that the plaintiffs failed to submit evidence of any such industry standard. Lastly, A & E cites the plaintiffs' alleged inability to determine exactly what services A & E received, noting that the amounts charged were estimates, which failed to adequately take into account usage by the estate and its tenants and improperly added a profit in MPLG's case.

A & E is correct that "[t]he reasonable value of service should be based on the customs and practices prevailing in the same sort of business in which the services would normally be provided." *In re Estate of Marks,* 187 S.W.3d at 32 (citing *Chisholm v. W. Reserves Oil Co.*, 655 F.2d 94, 96 (6th Cir. 1981)). "To prove the reasonable value of the goods and services, the party seeking to recover in quantum meruit can explain the method used to arrive at the fee or offer proof from other professionals in the same business or trade." *Williams v. Coffey,* No. E2007-01476-COA-R-CV, 2008 WL 1788060, *4 (Tenn. App. April 21, 2008). In this case, both Montgomery on behalf of the Trustee and Ball on behalf of MPLG explained the method they used to arrive at the fees requested. With the exception of the profit added by MPLG, both utilized a historical method of dividing the cost of operating the WWTP among the users of the facility. Granted, A & E's pro rata cost was based on an estimate of its use, but "[a]n estimation of the value of the services will suffice as long as it is sufficiently precise to enable the fact-finder to avoid a highly speculative assessment of damages." *In re Estate of Marks,* 187 S.W.3d at 32 (internal citations omitted); *see also Castilli v. Lien*, 910 S.W.2d 420, 428 (Tenn. App. 1995) (citing *Adams v. Underwood*, 470 S.W.2d 180, 184 (1971)) ("Courts will not award quantum meruit recoveries without some proof of the reasonable value of the goods or services, but the required proof may be an estimation of the value of the goods and services." (internal citations omitted)).

With respect to the Trustee's estimation of A & E's use, it was based on a relative comparison with the amount agreed to be paid by Paint Oak. Because Paint Oak was paying $27 a day for restroom use for its four employees, the sum the Trustee charged A & E, $50 per day, is not unreasonable when A & E not only had occasional restroom use by 20 employees and contractors, but was also regularly using water to wash its equipment and put out fires, with additional water being added to the WWTP by water pumped from basements. Moreover, Sawyer testified that the rate that would have been charged by the city of Morristown would have been $7.30 per 1,000 gallons. Although the water meter usage during the entire time the bankruptcy estate still owned the WWTP was not introduced into evidence, according to Sawyer's testimony the water

13

usage on A & E's meter was 339,600 gallons in January 2007 and 277,000 in February 2007. Applying the $7.30 per 1,000 gallons formula to the January and February water usage would result in bills of $2,479 and $2,022, respectively. In comparison, the Trustee's request of $50 per day, assuming 30 days in a month, results in a monthly charge of $1,500.

Accordingly, the court concludes that the sum sought to be charged A & E by the Trustee represents a reasonable value of the services provided it, even assuming that parties other than A & E were responsible for some of the waste water generated. Because, however, it would not be fair to charge A & E for services before it apparently even knew that it was being provided these services and before it had an opportunity to arrange alternative means of disposing of its waste water, the court concludes that a just assessment would be to charge A & E from December 18, 2006, the date the first invoice was delivered to A & E, through March 2, 2007, which under the court's calculation is 74 days at $50 per day or $3,700.

Similarly, MPLG used a cost-sharing formula that historically had been the basis for payment of waste water treatment services at the Lowland site. Although A & E argues that MPLG should not be able to recover because it failed to introduce evidence of the industry standard, Sawyer testified that had the waste water treatment services been provided by the city of Morristown, the amounts charged A & E from March through December 2007 would total $12,280.77. In this action, MPLG seeks a judgment of $20,355.97, which MPLG asserts represents the reasonable value of the services it provided to A & E. However, this amount includes late fees based on a 1.5% interest rate. Although Ball testified that this is an industry standard, there is no legal authority to assess a late fee absent an express agreement by the party to be paid this amount, which, as noted, does not exist in this case. Although an award of prejudgment interest is within the sound discretion of the court, the principles of equity must be foremost in the decision to make such an award. *See Union Planters Nat'l Bank v. Dedman*, 86 S.W.3d 515, 522 (Tenn. App. 2001). In this instance, because A & E reasonably disputed the obligations and the amounts of the obligations were not given to mathematical certainty, it would be inequitable to award prejudgment interest. *See Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405-06 (Tenn. App. 2005). Accordingly, any judgment awarded to MPLG should be reduced by the late fee charges totaling $2,933.51.

Moreover, the credits MPLG gave to A & E for its own water use at the time MPLG was still

14

on A & E's water meter were insufficient. These credits were $317.17, $100, and $200 based on a 5-10 gallon per day per employee estimate for MPLG's three or four employees. In contrast, the bankruptcy estate's contractual agreement with Paint Oak, which similarly had four employees, was based on an assumption of 500 gallons per day or 125 gallons per day per person. Because Paint Oak had agreed to the sum of $27 per day, this sum appears to be a much more accurate reflection of the true water usage by MPLG, especially considering that, according to Exhibit 64, A & E's water meter readings dropped from a range of 11,042 to 9,190 gallons per day to 2,486 gallons per day when MPLG obtained a separate water meter. As such, the court concludes that a more accurate credit, and one with a historical foundation, would be $27 per day for the 77 days from March 3 to May 18, 2007, which totals $2,079.

Regarding the 30% profit added by MPLG to the amount it seeks to assess A & E, MPLG cites two Tennessee cases that appear to recognize that the reasonable value of goods and services would include some measure of profit. *See Castilli v. Lien*, 901 S.W.3d at 430 (observing that the value of claimant's services as an interior designer fell somewhere between his actual material and labor costs and the amount of his bill); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 198 (Tenn. 2001) ("'[R]easonable value' of medical goods and services provided by a hospital to a patient . . . is to be determined by considering the hospital's internal factors as well as the similar charges of other hospitals in the community."). While the court would agree with that general assessment, no evidence was submitted as to whether a 30% profit is the standard in this industry or a reasonable profit, although Ball did testify that the capital expenditures paid by MPLG included $2,800 to repair a pump, and that unlike the practice of the previous owners of the WWTP, this cost was not passed on to the users of the WWTP. If the 30% profit were deducted from the invoiced amount, minus the late fees, the balance would be $13,401.89 ($20,355.97 - $2,933.51 = $17,422.46 ($17,422.46 ÷ 130%)). If a more reasonable profit of 10% were added to this amount, the sum would be $14,742.08, a number not completely out of line with the fee charged by the city of Morristown, but one which is appropriately higher to take into account that service by the city was not available and that the city has a much larger service population that would allow a lower profit based on the economy of scale. Based on this number, and subtracting the credit of $2,079 for the time that MPLG was on A & E's water meter, the court determines that a reasonable value of the services that MPLG provided A & E was $12,663.08.

15

Lastly on this point, the court rejects the argument raised by A & E that a reasonable value would not include waste water treatment services provided to other tenants on-site. By placing the water meter for all on-site water in its name, A & E assumed responsibility for the treatment and disposal of all waste water generated thereby. MPLG appropriately looks to A & E for payment since the water meter was in its name and it alone had the power to discontinue bringing water on to the site.

## IV.

An order will be entered in accordance with the memorandum opinion, awarding the Trustee a judgment against A & E in the amount of $3,700 and MPLG a judgment in the amount of $12,663.08.

# # #